UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

WILLIE JUNE SOREY,

     Petitioner,

v.                                    Case No. 5:14cv141/MW/CJK

JULIE JONES,

     Respondent.

_____/

## SECOND REPORT AND RECOMMENDATION

This habeas case, filed under 28 U.S.C. § 2254, is before the undersigned upon the District Judge's referral for consideration of whether petitioner has established cause, under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to excuse the procedural default of his ineffective assistance of trial counsel claim based on counsel's failure to advise petitioner of the availability of a voluntary intoxication defense. (Doc. 24). Petitioner's *Martinez* argument was raised for the first time in his objections to the Report and Recommendation dated May 25, 2015. (*See* Docs. 20, 22). Respondent has responded to the objections. (Doc. 25). After careful consideration, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter. Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts. The undersigned further concludes that the pleadings and attachments before the court show that petitioner has not established cause under

*Martinez, supra*, to excuse his procedural default.

PROCEDURAL HISTORY

Petitioner's habeas petition raises one claim: "The petitioner's conviction and sentence were obtained in violation of the Sixth and Fourteenth Amendments to the United States Constitution where the petitioner's trial counsel failed to inform him of the availability of a voluntary intoxication defense." (Doc. 1, p. 6 continuation page). Petitioner asserts in support of this claim that before trial he informed counsel that "near the time of the alleged offenses, he had consumed a large amount of alcohol", and that trial counsel responded that voluntary intoxication was not a defense to first degree murder. (*Id*.). Defense counsel prepared, and presented at trial, a defense of self-defense. (*Id*.). Petitioner asserts that at the time of his trial, voluntary intoxication was, as a matter of Florida law, a complete defense to first degree murder, and that had petitioner been informed of that fact he "would have testified at trial that he had consumed a large amount of alcohol near the time of the alleged offense." Petitioner argues that had his proposed testimony been placed before the jury, "it cannot be said beyond a reasonable doubt that the petitioner would have been convicted." (*Id*).

Respondent raised, among other arguments, a procedural default defense. (Doc. 12). The undersigned previously determined that the ineffective assistance claim is procedurally defaulted because it was never presented to the state courts and can no longer be litigated under state procedural rules. (Doc. 20, pp. 12-15). Petitioner's objections raised the issue of whether, under *Martinez v. Ryan, supra*, petitioner's lack of counsel in his initial-collateral review proceeding established cause for his procedural default. (Doc. 22, p. 2).

*MARTINEZ* STANDARD

In *Martinez v. Ryan, supra*, 132 S. Ct. at 1320, the Court held that "a procedural default will not bar a federal habeas court from hearing a "substantial claim" of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  In such instances, however, the underlying ineffective assistance of trial counsel claim must have some merit.  *See also Trevino v. Thaler*, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013) (extending *Martinez*'s holding to those state systems that, in actual operation, make it "virtually impossible" for an ineffective assistance of trial counsel claim to be presented on direct review).  In *Hittson v. GDCP Warden*, 759 F.3d 1210 (11th Cir. 2014), the Eleventh Circuit explained the "substantial claim" qualifier as established in *Martinez*:

> *Martinez* articulated the "substantial claim" requirement as follows:
>
>> To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).
>
> *Martinez*, — U.S. at —, 132 S. Ct. at 1318-19.  Neither *Martinez* nor *Trevino* elaborated on or applied this standard, but we take the Court's reference to *Miller-El* to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).
>
> As the Court explained in *Miller-El,* "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must show "that some jurists would grant the petition." *Miller-El*, 537 U.S. at 338, 123 S. Ct. at 1040. "[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id*.

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from *Strickland*.

*Id*., 759 F.3d at 1269-70 (footnotes omitted).

## APPLICATION OF *MARTINEZ* STANDARD

The present record establishes that petitioner did not have counsel in his initial-review collateral proceeding. The question is, thus, whether petitioner has presented a "substantial claim" of ineffective assistance at trial.

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   To obtain relief under *Strickland*, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id*., 466 U.S. at 687.  It is a petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof.  *Id*.  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id*. at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982).   A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See Michel v. Louisiana, supra*, 350 U.S. at 101, 76 S. Ct. at 164.

*Strickland*, 466 U.S. at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial

– for example, what witnesses he presented or did not present – were acts that some lawyer might do.'" *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1314-15 n.15 (11th Cir. 2000)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  Thus, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).  "[T]here are no 'absolute rules' dictating what reasonable performance is or what line of defense must be asserted."  *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317)).  "'Absolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions .'" *Id*. (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the *Strickland* standard, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Strickland*, 466 U.S. at 693. A defendant must show a "reasonable probability" of a different result.  *Id*. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome.  *Id.* at 694.  "The likelihood of a different result must be substantial, not just conceivable."  *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

The indictment against petitioner, filed on January 20, 1987, charged petitioner with first degree murder with a firearm and robbery with a firearm.  (Doc. 12, Ex. C,

p. 1).[1]   The first degree murder charge was based on alternative theories of premeditated murder and felony murder.  The victim was Willie Fred Wynn. The murder occurred outside Broxton's grocery store/game room in Graceville, Florida. (Ex. C, p. 3).

The trial record contains several witness statements that were filed with the court (and thus provided to the defense).  On January 27, 1987, the week following the indictment, the prosecutor filed the transcript of a recorded statement of petitioner's girlfriend, Carolyn Wilson Russell.  (Ex. C, p. 11-17).  Ms. Russell identified petitioner's nickname as "Red Pop" and stated that she and petitioner were living together on the date the shooting occurred. (*Id.*, p. 12).  Ms. Russell described that on the day of the shooting, petitioner left their home at approximately 4:30 p.m., to go to Broxton's.  Petitioner returned approximately 45 minutes to an hour later. When asked to "[d]escribe how he was when he came back", Ms. Russell stated that petitioner "was out of breath" like he had been running.   Russell indicated that petitioner was upset and that he said this:

> He [petitioner] said that him and Bill [the victim] had had some words, and Bill had took some money away from him.  He asked Bill to give him his money back, and he said Bill said, 'I ain't giving you nothing back, mother f-----.  You take it.'  He went around to his truck, opened his trunk, closed his trunk, had his hand in his pocket and when he came back to the front of the car, got ready to take his hand out of his pocket, and Pop [petitioner] shot him.

(Ex. C, p. 14) (expletive altered).   The interviewer asked Ms. Russell several questions to determine whether alcohol could have been a factor in the shooting. Specifically, the interviewer asked whether petitioner had been drinking the

---

[1]References to exhibits are to those provided at Doc. 12.

afternoon/evening of the shooting, whether petitioner had been drinking before he left to go to Broxton's, whether petitioner had been drinking at all that day, and whether petitioner seemed to have been drinking when he returned home and reported the shooting to Russell. (*Id*., pp. 16-17). Ms. Russell responded in the negative to all of these questions. (*Id*.). Ms. Russell stated that after petitioner returned home, he "got some few clothes and put them in a little black, in a little bag, and he left." (*Id*., p. 14). Ms. Russell described that petitioner was home for only 5-10 minutes, that he left in a hurry, and that he did not tell her where he was going. (*Id*., p. 15).

The State provided witness statements from fourteen others, all of whom had been at Broxton's at or near the time of the shooting. No witness so much as hinted that petitioner had consumed alcohol or was intoxicated. (Ex. C, pp. 60-143, 154-174).

The State also provided the defense with petitioner's statements to law enforcement, made when petitioner turned himself in to the Jackson County Sheriff's Department on December 8, 1986. Petitioner was interviewed that evening at approximately 9:30 p.m. by Investigator Branch, who described petitioner's statements as follows:

> Sorey stated in substance that he had went to Broxton's Bar and before going around back met a black male on the side of the bar. Sorey stated that the black male walked up to him and told him he needed some money to get home, and showed him (Sorey) a gun. The black male told Sorey that if he would give him $10.00, and keep the gun, that when he got back he would give Sorey $20.00, back for the gun. Sorey stated that he did so, then went around back and got into a dice game.
>
> Sorey stated that he had laid $5.00, on the ground while playing dice. Willie Fred Wynn walked up and picked up the money. Sorey states that he asked Wynn why he was getting his money, and Wynn just walked to his car opened the trunk and then closed it. Sorey stated that

he couldn't tell if Wynn got anything out of the trunk or not.  Sorey met
Wynn beside Wynn's car.  Sorey stated that Wynn said, "I'm not going
to give you any money" and then reached into his back pocket.

Willie June Sorey stated that he got his gun out and started
shooting Willie Fred Wynn.  Sorey stated that Wynn never pulled his
hand out of his pocket before he shot him.  Sorey stated that he did not
know how many times he shot Wynn, but Wynn fell to the ground and
he stopped.  Sorey then left the area and walked home.  . . .

(*Id.*, p. 23).   Petitioner gave a recorded statement to Investigator Branch at
approximately 11:15 p.m. on December 8, 1986.   A transcript of petitioner's
statement, which was filed with the court on January 27, 1987, provided, in
substance:

SOREY:  (Inaudible) particular me, like I said I was shooting crap, and
this guy Bill, ah,

BRANCH:  Wynn?

SOREY:  Wynn.  He just come up and stood around the crap game and
just picked my money up and walk away with it, and I asked the man for
my money.

BRANCH:  How much money are we talking about Willie June?

SOREY:  Five dollar.

BRANCH:  Five.

SOREY:  That's all it was, five dollars.

BRANCH:  Okay, go ahead.

SOREY:  So we got in an argument about the money, so he threatened
me and then he went to the back of his car, went in his trunk, and like I
said, I went around the side of the building, went at least in front of his

car toward the side of the building, met right there at the side of the build, between the building and his car, (inaudible) right there and asked him for my money again, and he just went in his pockets and pocket I just, and he, when he went in his pocket I never let him come out of his pocket, I just shot him.  That's all there was really to it.

BRANCH:  That's when you shot him, when he went, put his hand in his pocket?

SOREY:  Right.

BRANCH:  Front pocket or back pocket?

SOREY:  Seem like to me he had one hand in his back pocket and one was going in his front pocket, I don't know what he was doing.  But I know he had one in his back pocket.

BRANCH:  Where did you get the gun from?

SOREY:  Like I said, I took the gun and pawned it, wasn't thirty minutes before that.  It was some guy I don't even know the man.

BRANCH:  Had,

SOREY:  Said he had lost his money in a crap game, asked me to lend him ten dollars so he could get him some gas and go home and get some money, so he give me twenty dollars when he come back.

BRANCH:  Do you know this man?

SOREY:  Never seen him.

BRANCH:  Can you describe him?

SOREY:  Yes.  He was a tall, real dark skinned black man, about, he should have been about between thirty-five and forty.

BRANCH:  Have you ever seen him before?

SOREY:  No, I hadn't seen him before.  Yeah I have seen him on one occassion [sic], I seen him come through there.

BRANCH:  You ever talk to him before?

SOREY:  No, not really, (Inaudible) talk to him.

BRANCH:  Willie June did you ever see Bill Wynn or Willie Fred Wynn with a gun in his hand?

SOREY:  On that particular night?

BRANCH:  Uh-huh (indicates positive)  Now were [sic] talking about, you know, when this, when the shooting happened.

SOREY:  No, I couldn't say that.  I can't say I seen them guns cause it was dark.

BRANCH:  Did you see a knife or any other kind of weapon in his hand?

SOREY:  [W]hen he reached, that was it.

BRANCH:  Okay, you said he went to the trunk of his car.

SOREY:  Right.

BRANCH:  Did he open it up?

SOREY:  Right.  He open the trunk of his car I guess he got whatever he was getting, come around, like I say, come around his car and met me right there at the car, said now mother f----- you take their money, that's what you do, you just take the G-- D---- money, backed up and went in his pocket and that's when I shot him.

. . . .

> BRANCH:  You said he threatened you.  How did he threaten you
> Willie June?
>
> SOREY:  He just said, exact words I think was now mother f----- you
> gonna make me kill you or some s---, somethin like that, somethin like
> that, now mother f----- I, you gonna make me kill you now when he
> went to the trunk of the car.

(Ex. C, pp.  28-29) (expletives altered).  When asked if he and the victim were

friends, petitioner responded:

> SOREY:  No.  Once was at one time, until he, like I said, he just
> continuously taking things from me for a long time, about the last  year,
> and then about, I say about six, about six months ago he, he, he took
> some money out there, out ah, out of my old lady's mother's house, and
> he knew I knew he had it, and ever since then, ever since then just
> wanted me to know that he was going to do somethin to me any chance
> that he could get.

(*Id.*, pp. 29-30).  When asked how long he had been at Broxton's before the shooting

occurred, petitioner stated:  "No more than thirty five minutes.  Hadn't been there no

more than thirty, forty, minutes."  (*Id.*, p. 30).

Petitioner testified at trial about the shooting, in vivid detail:

> Q [Defense counsel]:  Now, starting in the late afternoon of that day,
> will you tell me what you were doing and where you were?
>
> A [Petitioner]:  I think it was about – it should have been around about
> 4, maybe 4:15, I come up to Broxton's Store and all right when I got
> there I'd say about two minutes after I arrived at the store, this young
> man come up to me.  He should have been about 35 to 40.  I'd seen him
> come through there but we had never really just conversated together.
> He said, "Hey, Pop, they do call you Pop, right?"  I said, "Yeah."  He
> said, "Well, they have a crap game around there.  I lost my money in the
> game."  He said, "If you will lend me $10 until I go home and come

back I will give you $20 for the gun." I said, "All right," being the type of guy that I am. I'm not what you call a model citizen or anything like that. So, I said, 'Yeah."

Q: You said you are or you are not a model citizen?

A: I'm not.

Q: All right. You were going to do what? Make a quick ten bucks?

A: Right, that's what I'm going to do because I know this man ain't going to leave his gun with me, you know, long enough, not no valuable gun like this for no $10. I know he's going to come back and get it. He said he was going to go home and win his money in the crap game. I said, "Okay" and I accepted the gun. After I accepted the gun, I went to the crap game . . .

(Ex. C, pp. 567-568). Petitioner then drew a diagram, based on his recollection of that evening, of the location of Broxton's building, the dice game, Mr. Wynn's car (including where the front and back ends were situated), nearby trees and benches. (*Id*., pp. 568-570). Petitioner continued:

A: All right, like I said, I come to the store and I met this guy here. I come on to the front of the store. This is the store. This is the front and this is the back of the store. I come and meet this guy here and we talk to right here. And we talk about the gun, which I already explained. All right. After I left here, I went to the crap game which was here. All right, so like I said, we was gambling, something that we wasn't supposed to do but this is what I do. All right, approximately I'd say anywhere from 15 to 20 minutes Bill Wynn pulls up. He comes around here and pulls his car right here. All right, I'm here. All right, you have got guys all around this circle. You have got guys gambling. When he get out of this car, he comes and he stands here. (Indicating)

Q [Defense counsel]: Now, at that time did you know Bill Wynn?

A: Yes, I did.

Q:  How did you know him?

A:  I have known Bill Wynn all my life, you know.  I knowed his family.  He knowed my family.  At one time we was calling ourselves what you would call "friends" until he betrayed this friendship.

Q:  Go ahead with that late afternoon.

A:  All right.  So it's about 4:30.  It's getting like dusk – dark but everyone can see pretty well so we are still gambling.  All right.  I have the dice when Bill comes up.  So, he comes and stands by me.  So, he start betting in the game, you know, but like I said, he was here about 15 minutes at the game before the incident occurred.  But, within that 15 minutes Bill Wynn had lost a lot of money because I hadn't lost the dice from the time that he got there.  And he lost a lot of money.  So, when he lost this great deal of money, he kept losing and then when I did lose the dice we have what you call a "bar".  If you go out 5, 9, 10 or 4, you have what you call a "bar" point.  You get the second part of your initiative bet back.  So when I told Bill Wynn, I said, "I barred."  He said, "No, you can't bar this."  I said, "Dogman, why?"  And he reached down and snatched my money up.  I said, "Why you going to take my money up like that?  You just going to take my money like that there?"  He said, "Yeah, if that's what you calling it, I'm taking it."  You know, I said, "Man, you can't rest easy like that taking my money like that.  You are not going to rest easy taking my money like that there."  I said, "With my money in your pocket."  Those was exact words I said.  "You're not going to rest easy with my money in your pocket."  He turned around and he said, "Well, you are not going to rest easy with it not being in your pocket," like this here.  And he said, "All these threats you're making . . ."  I said, "I haven't threatened you nare a time."  This is when this man [Wynn] come here from here and gone to the trunk of his car.  He come from here and stops about right here.  And I said, "Man, I haven't threatened you nare time.  Is what I'm saying about this here money, but you know it's mine and I would like to have my money back."  This is when after I told him I wasn't threatening him, he walked back to the crap game.  He did not open his trunk.

Q:  He did not open it at that time?

A:  The first time this man went to his trunk he did not open his trunk.

Q:  Okay, then what happened, Willie?

A:  All right, He came back to the crap game but after the argument started then everybody started frequenting the scene.  Everyone started to leave.  I was left there around, there was two or three guys around, I don't know if they want to come forward, maybe that is the problem.  I started picking my money off the ground and I said, in these words, "It's just like a –--- to come up here and start some s--- like this here."  This is what provoked this man to go back to his trunk.  This man opened his trunk and got whatever he got out of his trunk.  At this time I said, "Man, I don't see what you are getting so mad about, you know it's my money."  I started walking this way.  This man get whatever he got out of his trunk, he came this way.  And we meet right here somewhere up in here.  And I said, "Hey, Bill, all right.  You ain't got to give me my money, you know what I say.  You ain't got to give me the damn money."  He said, "No, you're going to make me kill you, –----."  I know this man.  I know this is a vicious man.

. . . .

A:  . . . Like I said, when he started this way I'm trying to tell this man, "Well, no, Bill you ain't got to give me my money, if you don't want to give me my money."  This man rushed at me from this point to this point, this man rushed at me.

. . . .

A:  If this is the car, this man come around the car from this angle.  Since he's to this trunk, I can't leave and go this way because the man right there to the back of his trunk.  So, I come this way, feel that maybe I can go around the corner.  But, no, this man meet me.  I'm not going to stand there and let this man, stand and let him do something to me.  I know this man went in his trunk.  I know this man brutalized or hurt

me. I know this man.  When this man come around the corner, I turned like this here.  When I turned he said, "Yeah, here is your damn money." He did something like this and with one hand he did this and with his right hand he reached like this.  When  he reached like this, this is why I left this man.  I shot this man.  And people saying I shot this man when he was on the ground, that's a lie.  I did not shoot that man when he was on the ground.  I shot that man, this man, when the bullets knocked him back so far he stumbled and fell.  When he fell I took off this way.  I changed my mind and turned back this way because instead of going around in front of the building I decided I will run the other way toward my house.  And I turned and I ran home and I didn't stop until I got home.

(Ex. C, pp. 570-576) (expletives altered).  Petitioner shot Mr. Wynn four times.  Two of the shots were to the back of Mr. Wynn's head.  (*Id*., p. 515).

The jury was given standard jury instructions, including instructions on the elements of first degree murder, lesser included offenses, justifiable homicide, excusable homicide and justifiable use of deadly force.  (Ex. C, p. 267-297).  The jury found petitioner guilty of first degree premeditated murder.  (Ex. C, p. 298).

At the time of petitioner's 1987 trial, voluntary intoxication could be asserted as a defense in Florida to specific intent crimes such as first degree murder.  *See Gardner v. State*, 480 So. 2d 91, 92 (Fla. 1985); *Gentry v. State*, 437 So. 2d 1097, 1099 (Fla. 1983).  The voluntary intoxication defense required that a defendant be "too drunk to entertain or be capable of forming the essential particular intent. . . ." *Garner v. State*, 9 So. 835, 845 (Fla. 1891); *Linehan v. State*, 476 So. 2d 1262, 1264 (Fla. 1985) ("We emphasize that voluntary intoxication is an affirmative defense and that the defendant must come forward with evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged"), *receded from on other grounds*, *Coicou v. State*, 39 So. 3d 237 (Fla. 2010).  An assertion that one is under the influence of an intoxicant is

not synonymous with being intoxicated. *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 902 (11th Cir. 2013) ("Mere use of intoxicants, . . . even to the extent that they 'arouse[d] passions, diminishe[d] perceptions, release[d] inhibitions or cloud[ed] reason and judgment,' was not enough to support a voluntary intoxication defense.") (alterations in original) (quoting Fla. Std. Jury Instr. (Cr.) 3.04(g) (1987))); *Jacobs v. State*, 396 So. 2d 1113, 1115 (Fla. 1981) (holding that a jury instruction on voluntary intoxication is not required where the evidence shows the use of intoxicants but does not show intoxication); *Linehan*, 476 So. 2d at 1264 ("[E]vidence of alcohol consumption prior to the commission of a crime does not, by itself, mandate the giving of jury instructions with regard to voluntary intoxication."); *Leon v. State*, 186 So. 2d 93, 94 (Fla. 3d DCA 1966) ("voluntary intoxication does not of itself prove absence of intent") (citing *Hall v. State*, 83 So. 513 (Fla. 1919)).

"The required mental state for first-degree murder is a 'premeditated design' to kill, which requires a specific intent to kill coupled with premeditation." *Reaves*, 717 F.3d at 902 (quoting Fla. Ann. Stat. § 782.04(1)(a)) (footnote omitted). Premeditation is defined as a "fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act," *Asay v. State*, 580 So.2d 610, 612 (Fla. 1991).

Because a voluntary intoxication defense requires that a defendant be too intoxicated to form intent, the Florida Supreme Court has found that defendants who have the ability to recall details of their offenses are not incapable of forming specific intent and, therefore, cannot assert voluntary intoxication. *See Davis v. State*, 875 So. 2d 359, 367 (Fla. 2003) (concluding that a defendant's detailed confession about the circumstances of his crime "substantially undermined the viability of a voluntary

intoxication defense"); *Occhicone v. State*, 768 So. 2d 1037, 1048-49 (Fla. 2000) (discussing "the potential harmful rebuttal that could have been presented by Dr. Mussenden concerning Occhicone's vivid recall to him of the details surrounding the murders, a recall inconsistent with heavy intoxication"); *Withers v. State*, 104 So. 2d 725, 726 (Fla. 1958) ("It is inconceivable that Withers could have recalled all of the sordid details delineated in said confession had he been at the time of the commission of the crime too intoxicated to have been capable of premeditation.").  Further, "if passion and revenge have temporarily dethroned a man's reason, and in this condition he has committed a crime, then the fact that he is intoxicated must necessarily not have played any part in his crime; for it is passion or revenge, and not intoxication, that have affected his reason." *Garner*, 9 So. at 846.

Here, the only evidence petitioner proffers to support his claim that he had a viable voluntary intoxication defense is his self-serving statement, made 27 years after his trial, that he told counsel "that near the time of the alleged offenses, he had consumed a large amount of alcohol." (Doc. 1, p. 6 continuation page).  Even assuming petitioner did, in fact, state this to counsel, petitioner has not raised a substantial claim that counsel was deficient for failing to pursue a voluntary intoxication defense (or advise petitioner of its availability).  First, petitioner's vague assertion that he "had consumed a large amount of alcohol" was not accompanied by either a claim of intoxication or facts indicating intoxication.  To the contrary, petitioner recalled with clarity and detail – both in his recorded statement to law enforcement and in his trial testimony (which petitioner would have related to defense counsel prior to trial) – what happened at Broxton's from the moment he got there until the moment he left.  Petitioner recounted with specificity the circumstances surrounding his obtaining a gun, his arguing with Wynn and his shooting of Wynn,

including their precise conversation and movements.  Petitioner gave no indication of absence of memory, much less the extensive absence of memory of someone who was so heavily intoxicated that he would be able to assert a voluntary intoxication defense.

Second, when petitioner related the details of that evening to law enforcement, he made no mention of having consumed alcohol, much less of having consumed such a large amount of alcohol as to become intoxicated.  Third, Ms. Russell (petitioner's girlfriend) described the afternoon/evening of the shooting, including that petitioner had not been drinking before he left for Broxton's, that petitioner was gone only 45 minutes to an hour, that when petitioner returned he did not appear to have been drinking, and that when petitioner returned he related to her a hurried, but detailed account of the shooting.  Fourth, not one of the fourteen witness statements provided to the defense either made mention of petitioner consuming alcohol at Broxton's that evening, or made the remotest suggestion that petitioner was intoxicated.  Fifth, as revealed in Ms. Russell's statement and petitioner's version of events, petitioner had the presence of mind and mental capacity to immediately run home, recount the crime to Ms. Russell, pack a bag and flee to South Florida.  Given the complete lack of evidence supporting a voluntary intoxication defense, and given petitioner's own recollection of the shooting which was so detailed it ran counter to a theory of heavy intoxication, petitioner cannot show that no competent attorney would have declined to pursue a voluntary intoxication defense.

Petitioner also has not raised a substantial claim that had counsel pursued a voluntary intoxication defense with petitioner's proposed evidence (petitioner's trial testimony that he "had ingested a large quantity of alcohol near the time of the alleged offense"), there is a substantial likelihood, in light of all of the evidence presented at

trial, that the outcome of petitioner's trial would have been different.  There was overwhelming evidence that petitioner possessed the presence of mind to make a conscious and purposeful decision to kill Mr. Wynn, and that petitioner's actions were deliberate and arose out of anger with Wynn for having taken his money during the dice game.  (*See* Ex. C, pp. 397-430).  The Eleventh Circuit's discussion of a similar ineffective assistance claim in *Reaves, supra* is instructive:

> The second reason we are convinced that Reaves has failed to carry his burden of proving a reasonable probability of a different result if a voluntary intoxication defense had been pursued is all of the evidence showing that he not only was capable of formulating a premeditated design to kill the deputy, but also actually did so.  His undisputed actions and statements before and after the murder prove that he possessed the presence of mind to make a conscious and purposeful decision to kill the deputy, which negates a voluntary intoxication defense.  Reaves told the officers who questioned him that he had shot the deputy because he believed that, as a convicted felon, he was facing a mandatory sentence for unlawfully possessing a firearm, and he did not want to go back to prison.  Those facts, which are not contradicted by any evidence, prove that Reaves' actions were deliberate and motivated by a desire to avoid going back to prison. . . . Reaves had the presence of mind and mental capacity to immediately flee the area of the shooting, hide in the woods, and take other evasive action in order to avoid a sizeable police manhunt as he traveled seven miles on foot.  And as soon as he arrived at Hinton's home he showered and changed his clothes.  Reaves' ability to later recall the incident in considerable and vivid detail is more evidence weighing against a voluntary intoxication defense.

717 F.3d at 904.

Jurists could not conclude that petitioner's claim is adequate to deserve encouragement to proceed further.  As petitioner has not established cause under *Martinez v. Ryan, supra*, to excuse his procedural default, he is not entitled to merits review of his claim.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted).  Therefore, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.    That this Report and Recommendation, and the first Report and Recommendation dated May 25, 2015 (doc. 20), be ADOPTED.

2.    That respondent's motion to dismiss the petition for lack of jurisdiction as an unauthorized second or successive habeas corpus application (doc. 8) be DENIED.

3.  That the petition for writ of habeas corpus (doc. 1), challenging petitioner's judgment of conviction and sentence in *State of Florida v. Willie June Sorey* in the Circuit Court for Jackson County, Florida, Case No. 86-CF-521, be DENIED on the grounds that petitioner's claim is procedurally defaulted.

4.  That the clerk be directed to close the file.

5.  That a certificate of appealability be DENIED.

At Pensacola, Florida this 27th day of July, 2015.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th CIR. R. 3-1; 28 U.S.C. § 636.